No. 12,210.

POITEVENT & FAVRE LUMBER COMPANY VS. STANDARD PLANING MILLS AND MANUFACTURING COMPANY, LIMITED.

It appearing from the evidence that the president of a going corporation disposed of a portion of his surplus stock of mules to a creditor, with the consent and approval of its board of directors, under the impression that the company was solvent, and with the object of tiding over a temporary financial embarrassment and without interrupting the operations of its plant, it is not liable to an attachment on the ground that the evident intent of the president and board of directors was to fraudulently dispose of the property of the corporation, or to give to some of its creditors an unfair preference.

APPEAL from the Civil District Court for the Parish of Orleans. *Rightor, J.*

*Farrar, Jonas & Kruttschnitt* for Plaintiff, Appellant.

*Joseph Brewer* and *Ernest T. Florance* for Defendant, Appellee.

Argued and submitted November 16, 1896.
Opinion handed down November 30, 1896.
Rehearing refused January 18, 1897.

The opinion of the court was delivered by

WATKINS, J.   This is an ordinary action upon a matter of indebtedness of the corporation, coupled with a writ of attachment.

Defendant's counsel took a rule upon the plaintiff for the dissolution of the writ on several grounds; and upon the trial thereof same was dissolved, and the seizure discharged. Thereupon the case went to judgment on the debt—there being practically no dispute as to that—and therefrom the plaintiff has appealed, seeking the reinstatement of its writ and the restoration of its seizure.

Dealing with the judgment dissolving the writ of attachment, it will be only necessary for us to discuss one of the grounds enumerated, and that is the alleged untruthfulness of the affidavit to obtain the writ, in point of fact, as in our opinion that is fatal.

The affidavit is grounded upon Code of Practice, Art. 240, paragraph 4, and affirms that the defendant had parted with or disposed of, or was about to part with or dispose of his property or some part thereof " with intent to defraud his creditors, or give an unfair preference to some of them."

We make the subjoined extracts from the brief of plaintiff's counsel as most completely expressing its views of the legal situation as it is presented upon the testimony taken at the trial, viz.:

" We do not claim that Mr. Gause, the president of this corporation, was guilty of a corrupt intent to perpetrate a dishonest and immoral act, but we do say that he was guilty of acts which the law denounces as a fraud in law, or as giving a right to a creditor to a writ of attachment, and that he is conclusively presumed to have intended the consequences of his acts.

We say further, that it is not necessary that a debtor should have been guilty of fraud in a moral sense, or even in the legal sense, in

·order to entitle a creditor to a writ of attachment. It suffices that proof should be made of an intent to give an unfair preference to a ·creditor, and that intent unquestionably existed in this cause.

"We say that the president of the company intended to make a *dation en paiement* to a stockholder at a time when the corporation was insolvent, and we say that that *dation en paiement* was necessarily a fraud at law, and therefore when he executed the *dation en paiement* he intended the fraudulent preference. Not only does the Code declare such a *dation en paiement* to be an absolute nullity (C. C. 2658), but the courts have over and over held that such a dation is a legal fraud and may be set aside. See Lovell vs. Payne, 30 An. 511, and an overwhelming mass of authorities cited in *Hennen, verbo Obligations, 7, p. 1036, et seq.,*" p. 14.

· Again:

"The counsel for the receivers seems to attach great weight to the fact that there was no concealment of his acts by Mr. Gause; that he admitted all the facts of the case when complaint was made to him by Joseph A. Favre, the treasurer of the plaintiff corporation, and that he made certain offers to Mr. Favre similar to the offers which he had made to Jay and to others, and which offers had been accepted by Jay and others.

"We do not think that this frankness of Mr. Gause affects the legal rights of the parties at all. Even admitting the most that was claimed by counsel, or by any of the witnesses in the lower court, all that is shown by the evidence is that an offer was made to the plaintiffs to give them an illegal preference similar to the one given to other creditors of the defendant. Had the offer been accepted, the plaintiffs would have obtained an utterly worthless preference, and that they chose to refuse it and to take out an attachment does not weaken their position in the least.

"Counsel for the liquidators takes great pains to show that Mr. Gause was honest in all that he did.

"Allow us here to repeat that we are not accusing him of any moral turpitude, and that it may be conceded that he did not intend to do anything morally wrong. He did, however, unquestionably *give preferences which he thought that he had the right to give,* but which are clearly illegal under the laws of the State of Louisiana, which were clearly void, and which clearly entitled other creditors to writs of attachment.

Lumber Co. vs. Manufacturing Co.

"All the evidence upon the subject of the interview between Mr. Favre and Mr. Gause is given by Mr. Gause himself, Mr. Favre and two other creditors who were present at the time, to-wit: Mr. Billington and Mr. Brownell." Page 17.

Evidently the plaintiff's counsel rests its case almost exclusively upon the *proven* insolvency of the defendant corporation, and its having given property thereafter in satisfaction of the claims of certain of its creditors; and adequate corroboration of this is found in this sentence, viz.:

"We say further, that it is not necessary that a debtor should have been guilty of fraud in a moral sense, or even in a legal sense, in order to entitle a creditor to a writ of attachment. It suffices that proof should be made of an intent to give an unfair preference to a creditor, and that intent unquestionably existed in this cause.

"We say that the president of the company intended to make a *dation en paiement* to a stockholder at a time when the corporation was insolvent, and we say that that *dation en paiement* was necessarily a fraud in law," etc.

But was the corporation insolvent as a matter of fact? What is the proof on this question?

As a witness the president of the defendant corporation makes answers to questions propounded as follows, viz.:

"Q. What was the amounts of the debts of the defendant say on the 1st of June, 1895?

"A. With notes we had given, other people's notes, it was about fifteen thousand or sixteen thousand dollars.

"Q. That included all the mortgage notes on the real estate?

"A. No.

"Q. How much did they amount to?

"A. The mortgaged notes amounted to ten thousand eight hundred and fifty dollars.

"Q. Then the total amount of the debts of the company approximated twenty-seven thousand dollars?

"A. Yes.

"Q. Was a statement of this debt presented at the meeting of the creditors on the 28th of May?

*      *      *      *      *      *      *

"A. I think so.

"Q. Approximately?

" A. Yes; including other people's notes that had not been paid.

" Q. But those were liabilities of the concern?

" A. Yes."

The foregoing statements were elicited upon the cross-examination of the witness, and the following occurred in the course of his re-examination, viz.:

" Q. You stated that the indebtedness of the company at the time was in the neighborhood of twenty-seven thousand dollars; now state what their assets consisted of?

" A. Our real estate cost nearly fourteen thousand dollars, and we paid nearly three thousand five hundred dollars out of it. It is appraised at thirteen thousand dollars now. Our lumber was then considered worth six thousand dollars. Our machinery and sheds and teams cost twenty-two thousand dollars; and our bills collectible amounted to four thousand dollars or five thousand dollars.

" Q. Out of this total of forty-six thousand dollars, what would you consider a fair estimate of the actual value of the assets of the concern?

" A. Well, I consider the real estate worth fourteen thousand dollars; the machinery and sheds cost twenty-two thousand dollars, and as a running outfit it ought to be worth fifteen thousand dollars; the lumber ought to bring five thousand dollars; and the bills, perhaps, three thousand dollars or four thousand dollars.

" Q. Then you estimate the value of (the assets) of this corporation at the time of taking out of the writ of attachment, in the neighborhood of thirty-nine thousand dollars?

"A. Yes; as a running plant," etc.

This statement is not contradicted by any other witness, and is practically undenied.

In the course of the argument it was said that in the director's answer to the petition of creditors of the corporation in the District Court praying for the appointment of a receiver, there is an admission of the insolvency of the defendants, and that those proceedings were commenced only a few days subsequent to plaintiff's attachment; and plaintiff's counsel urge this judicial admission as conclusive proof of the insolvency of the defendant at date its attachment issued.

But this answer having been filed by the directors subsequent to the attachment it can not have any retroactive effect in reference to

Lumber Co. vs. Manufacturing Co.

the fraudulent intent of the defendant at the date of and antecedent to the making of the affidavit.   An attachment is a harsh remedy, and must be strictly construed.   It must depend upon the state of facts existing when it was applied for.

On the question of fraudulent intent, the president was interrogated fully as to the details of all the transactions upon which the plaintiff founded its attachment, and thereupon the following occurred, viz.:

"Q. What was your intention in transferring these materials to creditors?   I am asking you now in regard to the allegation of the petition that the transfers (of property) were made with the intent to defraud the creditors, or give an unfair preference to some of them,   Now what was your intention in making those transfers?

"A. I offered some lumber to Mr. Favre.   In the first place, in regard to the teams: one-half of our teams were on pasture for six months or more, and we did not have any use for them.   I consulted the directors, and we came to the conclusion that we *could run our business* with one-half the teams.   They were an expense to us, and *with one-half we would still have enough to carry on business.*   So I advised with them, and they consented and agreed to transfer some of them at a good round figure.   We sold those teams at a figure which would to-day be twice as much as they would sell for at auction, or sheriff's sale.

"Now, in regard to the lumber that I sold; my idea in selling that was to get a better price, with the exception of the lumber I sold to Mr. Billington.   And I was satisfied that if we could have sold our lumber and collected our debts, that it would have gone far toward paying the indebtedness of the corporation without touching the plant.   And I wanted to cancel as many debts as possible in that way; by selling lumber at a better price.

"I had no idea that any one would object to my making any such sales.   But as soon as any one objected, I (did) not sell another dollar's worth of goods to any creditor.   As soon as objection was made I stopped immediately."

Counsel for plaintiff insists in applying to this case the precepts of our jurisprudence applicable to the intent to defraud in matters of insolvency; but should we do so, the facts adduced and quoted in part herein would not, in our opinion, justify us in reversing the judgment of the District Court.

In Burdeau vs. His Creditors, 44 An. 11, we find quite a similar case stated.

In that case certain of his creditors opposed the discharge of the insolvency on specifications of fraud, to the effect that he had given an undue preference to some of his creditors by giving them mules in partial payment of their claims notwithstanding his insolvency at the time.

The opinion says:

" Whether the insolvent be *guilty* of *fraud* or not under this section, is, in the first place, dependent on a question of fact as to the insolvent's commission of the reprobated act; and in the second place, on the fact of his having successfully rebutted the legal *presumption of guilty intent* raised on the proof of the act."

Having examined the facts and applied them to the provisions of the insolvent law, the opinion proceeds thus:

" These precepts of the insolvent law have often been examined and interpreted, and in so doing our predecessors have said that they are highly penal in character, and in their consequences on conviction of fraud, and must be strictly pursued. The acts charged must not only be such as the law declares fraudulent, but *done with fraudulent intent.*"

Citing Campbell vs. His Creditors, 16 La. 348.

Our predecessors have frequently employed, in this connection, such emphatic language as this, viz.:

"To constitute fraud there must be an intention of defrauding, *consilium fraudis*, and an actual loss, *eventus damni.*"

Montilly vs. Creditors, 18 La. 383; Slocomb vs. Bank, 2 R. 92.

Upon this statement of the law as applied to the facts stated, the judgment of the lower court in favor of the insolvent rejecting the demands of the opponents, was affirmed.

From the evidence in this case it conclusively appears that the defendant corporation was, at the time of the transactions which are complained of, a going concern in full operation, and that the evident object sought to be attained thereby was to tide over a temporary embarrassment, by disposing upon favorable terms of a portion of the company's surplus stock without, in any way, interfering with the operations of the plant.

We can not regard them in the light of fraudulent transactions or as having conferred unfair preferences, with an intention of injuring

other creditors of the corporation, even in the light of the insolvent laws.

But, viewing them in the light of jurisprudence upon the subject of attachment, we think the judgment must be affirmed, for by a long line of adjudications, commencing with those rendered by the court immediately subsequent to the amendment of the Code of Practice in 1868, it has been uniformly and consistently held, that the *intent to defraud* is the essential ingredient, without proof of which an attachment under its provisions could not be sustained.

The language of the enactment is "with intent to defraud his creditors, or give an unfair preference to some of them." C. P. 240, No. 4.

In Hoy vs. Weiss, 24 An. 269, it was held that "the evidence must show affirmatively that the defendant is about encumbering or disposing of his property with the intent of defrauding his creditors."

To the same effect is Moulor vs. Rosengarden, 22 An. 531.

In Abney vs. Whitted, 28 An. 818, it was said that "the intent is the essential ingredient, and we think neither the petition nor the evidence shows such intent in the defendant. The simple fact of giving a mortgage to secure a creditor's claim does not of itself give a ground for the writ."

In Hermann vs. Amedee, 30 An. 395, it was held that the fraudulent intent necessary to support an attachment is not shown by the mere fact that a merchant is selling property and paying off debts, including that of the plaintiff.

Very much the same opinion is expressed by the court in Hernsheim vs. Levy, 32 An. 340.

Later adjudications by the court as at present constituted are of exactly similar purport.

In Ferguson vs. Chastant, 35 An. 339, the court said:

"The intent to defraud must justify the attachment. It does not suffice that appearances indicate it."

In Lehman vs. McFarland, 35 An. 624, it was held that an attachment could not be sustained when the "proposed disposition of their property by the defendants was in the interest of their creditors, whom they proposed to place on a footing of equality and fairness."

In Bank vs. Moss, 41 An. 227, it was held that fraudulent intent existing at the time of the act complained of, controls.

In Seeligson vs. Rigmaiden, 37 An 722, it was held that fraudulent intent must *exist;* appearances are not sufficient.

·In Chaffe vs. Mackenzie, 43 An. 1062, we said: "In order to sustain an attachment there must be proof that at the time the writ issued the defendant had done, or was about to do the acts charged. The intent also must exist to defraud or to give an unfair preference. This intent, which rests in the bosom of the defendant, can only be shown by the acts and declarations of the defendant, and the conclusions to be drawn from them."

And in the recent case of Winter vs. Davis, 48 An. 260, we affirmed and emphasized what had been so frequently said, and employed the following language in so doing, viz.:

"An attachment based upon Nos. 4 and 5 of Art. 240, C. P., must be supported by proof of an act or acts showing the fraudulent intent of the defendant to place his property beyond the reach of his creditors, or to give an unfair preference to some of them."

Again:

"It is not evident that the intention of the defendant was to place his property beyond the reach of his creditors, or to dispose of it so as to give an unfair preference. These are the essentials to ·sustain an attachment." *Vide* also, Claflin & Co. vs. Davis, 48 An. 1223. See also John P. Baldwin, Receiver, vs. McDonald, 49 An., just decided.

The judge *a quo* entertained the opinion that the proof did not establish that defendant had disposed of its property with a fraudulent intent, and dissolved plaintiff's attachment, and in our opinion he was right in so doing.

Judgment affirmed.