200 So. 21

**DOUGLAS PUBLIC SERVICE CORPORATION v. LEON.**

No. 35717.

Jan. 6, 1941.

Baldwin, Haspel & Molony, of New Orleans, for plaintiff, appellant.

Grace & Regan and Lazarus, Weil & Lazarus, all of New Orleans, for defendant, appellee.

ODOM, Justice.

The Douglas Public Service Corporation brought suit against Harry Leon for $7,-800, alleging that the defendant owned certain specifically described real estate and personal property in the City of New Orleans. It alleged that the defendant was

about to dispose of all the property described "with intent to defraud his creditors and particularly your petitioner; that he has converted or is about to convert his property into moneys or evidences of debt with intent to place it beyond reach of his creditors". It prayed for a writ of attachment, commanding the sheriff to attach said property. The writ issued, and the property was attached.

Leon, the defendant, ruled the plaintiff to show cause why the attachment should not be dissolved on the ground that the allegations in plaintiff's petition setting out the cause for the issuance of the writ of attachment were false and untrue. Defendant prayed that the attachment be dissolved and that plaintiff be condemned to pay attorney's fees in the sum of $1,000, and that his right to proceed against plaintiff for such further damages as he may have sustained be reserved.

The trial of the rule was had, and after the hearing the attachment was dissolved and plaintiff was condemned to pay attorney's fees in the sum of $500. From this judgment plaintiff appealed.

The attachment was sought under the provisions of Article 240 of the Code of Practice, which provides that a creditor may obtain an attachment of the property of a debtor—

"4. When he *has mortgaged, assigned or disposed of, or is about to mortgage, assign or dispose of his property,* rights or credits, or some part thereof *with intent to defraud* his creditors or give an unfair preference to some of them.

"5. When he *has converted, or is about to convert his property* into money or evidences of debt, *with intent* to place it beyond the reach of his creditors."

It was proved at the trial—in fact, it was never disputed—that, at the time the suit was filed and the writ of attachment was issued, the defendant was about to dispose of certain real estate which he owned and which was attached. The facts are that he had executed a contract under which he had obligated himself to sell the property for $2,800 cash. The sale had not been consummated, but it is admitted that, but for the attachment, it would have been completed within a short time.

The ground set up by defendant for dissolving the attachment was that, whereas defendant did intend to sell, and was about to sell, the property, he was not doing so with intent to defraud his creditors or to give an unfair preference to some of them, or with intent to convert the property into money or evidences of debt with intent to place it beyond the reach of his creditors. The sole issue involved, therefore, is whether Leon, the defendant, was guilty of fraudulent intent in his attempt to dispose of his property.

In order to sustain an attachment sued out under Article 240 of the Code of Practice on the ground that a debtor has mortgaged, assigned, or disposed of his property, or is about to do so, with intent to defraud his creditors, or is about to convert his property into money or evidences of debt with such intent, it must be shown that the debtor intended to defraud his

creditors. The intent is the principal ingredient of the cause of action. In order to prove fraudulent intent, the acts and declarations of the debtor, as well as the surrounding circumstances, may be shown, since intent, which is subjective, can only be proved by objective signs. It is well settled that an actual fraudulent intent must exist on the part of the debtor. Mere appearances are not sufficient, even though the conduct of the debtor may indicate an intent to defraud.

In Ferguson v. Chastant, 35 La.Ann. 339, the court said:

"The intent to defraud must exist to justify an attachment. It does not suffice that appearances indicate it." Citing Abney v. Whitted, 28 La.Ann. 818; Herrmann v. Amedee, 30 La.Ann. 393, and authorities there cited.

The above extract from the Chastant case was quoted with approval in the case of Lumber Co. v. Standard Planing Mills, Ltd., 49 La.Ann. 72, 21 So. 194, where many of the earlier cases touching this point were cited and reviewed.

In the case of Abney v. Whitted, supra, cited in the Chastant case, supra, plaintiffs' debtor had mortgaged her plantation and residence to one of her creditors and had confessed judgment in a large sum in favor of the mortgagee, but refused to secure the plaintiffs' claim either by giving a mortgage or by confessing judgment. The issue involved was whether the plaintiffs' debtor intended to defraud them by granting a mortgage and confession of judgment in favor of another creditor. In

speaking of the "intent to defraud", as that term is used in Article 240 of the Code of Practice, the court said:

"The intent is the essential ingredient, and, we think, neither the petition nor the evidence shows such intent in the defendant. The simple act of giving a mortgage to a creditor to secure his claim does not of itself give a ground for the writ."

In Abel & Bach Co. v. Duffy, 106 La. 260, 30 So. 833, it was held that to sustain an attachment the fraudulent intent of the debtor must appear, or facts and circumstances must be shown from which it may reasonably be inferred, and that "It may well happen that an attachment itself is not authorized, and yet there be justification on the part of plaintiff in resorting to it" (Paragraph 2, Syllabus).

In Fidelity & Deposit Co. v. Johnston, 117 La. 880, 42 So. 357, 360, the court said:

"The articles [of the Code of Practice] authorizing the writ of attachment for cause alleged were not intended to afford a conservatory remedy in all cases in which a creditor has suspicions which are not afterwards sustained by sufficient affirmative evidence of intention to defraud. The fraudulent intent must be shown." Citing several cases.

A debtor's attempt to dispose of some or all of his property, especially when he is in failing circumstances, or his granting a mortgage in favor of one creditor, leaving others unsecured, may, but does not necessarily, afford sufficient ground to support an attachment. It all depends on the debtor's intent. If the surrounding circumstances,

coupled with the acts and doings of the debtor, clearly indicate his intent to defraud, the attachment should be sustained. Otherwise it should be dissolved.

The debt which the plaintiff claimed was due it by the defendant Leon is not a liquidated debt in the sense that the amount due, if any, was agreed upon. There is considerable controversy between plaintiff and defendant as to the amount due, if any, and Leon as a witness denied that he owed plaintiff anything. The circumstances under which the controversy as to whether the defendant owes the plaintiff anything are rather peculiar and somewhat complicated. Plaintiff is a public warehouseman, and Leon was engaged in the business of buying and selling scrap-iron and junk. When he purchased such materials, he stored them in plaintiff's warehouse, and the plaintiff issued to him negotiable warehouse receipts for the scrap-iron and junk stored. The warehouse receipts certified that a certain quantity by weight of scrap-iron and junk had been stored, and under the terms stipulated in the receipts the holder or owner of them was entitled to demand and to receive the amount of junk called for in case the face value of the receipts was not paid.

Leon, to whom a number of these warehouse receipts were issued by the plaintiff, pledged some of them to the Mercantile Credit Corporation. He did not redeem them when due, and the Mercantile Corporation had them sold and bought them in at considerably less than their face value. Later on, the Mercantile Corporation demanded that plaintiff deliever to it the amount of metal or junk called for by each certificate. When the demand was made, it developed, so plaintiff alleged, that there was not as much junk on the yard as the certificates called for, and the Mercantile Corporation made demand on the plaintiff for the value of the missing junk, which plaintiff alleged was $7,800 and which amount it claims it paid to the holder of the certificates.

At the time the contract was entered into by the plaintiff and the defendant, it was provided that a man named Paul Miller should have charge of the junk yard, receive and weigh such junk as Leon delivered, and certify the amount received to the plaintiff warehouseman, and the warehouse receipts were issued on the certificates of Miller. Miller was selected as custodian by the plaintiff. But Leon by special contract specifically bound and obligated himself to pay all such damages or losses as plaintiff might sustain on account of any dishonest conduct of Miller. In other words, Leon was a guarantor of Miller's honesty.

Plaintiff's contention is that the quantity of scrap-iron and junk stored on the yard was 600 tons less than Miller certified had been delivered and for which it had issued its negotiable warehouse receipts, or, in the alternative, if delivered, it was abstracted or permitted to be abstracted from the warehouse by Miller, and, since Leon by his contract guaranteed the warehouseman against the dishonest conduct of Miller, Leon is indebted to plaintiff for the value of the missing property.

Plaintiff alleged that it was unconditionally bound for the amount of the warehouse

receipts and that it had been compelled to pay the Mercantile Credit Corporation, Leon's pledgee of the certificates, the sum of $7,800.

Leon does not seek to evade his obligation to pay the plaintiff such damages as it may have sustained on account of Miller's dishonesty. But Leon's contention is that as a matter of fact none of the property was used or diverted through the dishonest dealings of Miller, although he admits that there was a shortage in tonnage. Hence the dispute between plaintiff and defendant as to the amount, if any, due plaintiff by defendant. This was the situation, in so far as the question of Leon's indebtedness to the plaintiff was concerned, at the time the present suit was filed. Leon was liable only for the dishonest conduct of Miller.

We have stated in detail the controversy between plaintiff and defendant relating to the question of indebtedness, because it seems to us to have a bearing on the question of Leon's intent when he attempted to dispose of his property. It is not quite reasonable to suppose that Leon would have attempted to dispose of his property in order to defeat the claim of the plaintiff, since it was by no means certain, according to the testimony, that Leon owed plaintiff any amount. To say the least, it clearly appears that the amount due by Leon, if any, to plaintiff on account of the transactions detailed above would have to be ascertained at the end of a lawsuit.

The trial judge was not convinced that Leon intended to defraud this plaintiff, nor are we. The testimony shows that at some time prior to the filing of this suit

Leon advertised his junk yard for sale in a journal called "Waste Trade Journal", which was published outside the state. This indicates, at least, that he was making no secret of the fact that he wanted to dispose of some of his property.

The circumstances surrounding Leon's attempted sale of the real estate which was attached do not prove, or even indicate, that he intended thereby to defraud his creditors. The facts are that a real estate dealer in the City of New Orleans, representing one of his clients, sent one of his employees to Leon in order to ascertain whether Leon was willing to grant a lease on the property. Leon told the representative of the real estate dealer that he would not be willing to lease the property but would be willing to sell it for $3,000 cash. Later on, the real estate dealer offered to purchase the property for his client at $2,500. Leon refused the offer, and a counter proposition was made to pay $2,750. The parties finally agreed on a sale at $2,800. Whereupon a contract to sell it at that price was signed by Leon. These negotiations were conducted over a period of several days, were not secret, but were carried on in the open. These facts, viewed in connection with the further fact that the negotiations leading up to the signing of the contract to sell were not opened by Leon but by the real estate agent, do not indicate that Leon was attempting to dispose of the property to defraud his creditors.

The testimony further shows that, a short time prior to the filing of the suit, Leon had offered to make a dation en paiement of this property to another creditor in payment of

a debt, and that the only reason the dation was not made was that the parties could not agree on the price. There is evidence that a certain party who was connected with the plaintiff in this suit had knowledge of this offer of Leon's.

It took nine days to try the motion to dissolve, and the testimony adduced is voluminous. It shows that Leon had during previous years owned stock in, and controlled, various and sundry corporations, and there is some testimony which indicates that a number of his transactions were questionable from the standpoint of honesty and fair dealings. Knowing this, it is not unnatural that plaintiff should be suspicious of Leon's conduct at the time the attachment was sued out. But, conceding that Leon had previously been guilty of transactions which in the minds of plaintiff's officers and others were shady, that is not sufficient ground for holding that, in so far as the particular transaction complained of was concerned, he intended to defraud his creditors. The right to attach depends on the state of affairs existing at the time the writ is issued.

We think the judgment dissolving the attachment was correct.

The remaining question is whether the amount awarded as attorney's fees for dissolving the attachment should be reduced. The trial judge allowed $500. This amount was not excessive. It took nine days to try the case, and the testimony taken covers approximately 400 pages. Counsel for plaintiff in rule, in addition to their work in the lower court, prepared and filed briefs in this court. All the work done by counsel was under the eyes of the trial judge, whose opinion as to value of services of this kind is entitled to great weight. We shall not disturb the award.

For the reasons assigned, the judgment is affirmed.

O'NIELL, C. J., does not take part.