In Dupree v. Uzee, 6 La. Ann. 280, it was held (quoting from the syllabus):

"A party will not be allowed to do that indirectly which cannot be done directly; and where a person, wishing to evade the prohibition of the law against donations to a concubine, has the title to a slave purchased by him made out as though the purchase had been made by the concubine, her title is no better than if it had been a donation in form. C. C. 1468 [now 1431]. The concealment of a donation to a person incapable of receiving, under the form of an onerous contract evidenced by a notarial act, is in law a fraud upon the heir; and to establish that fraud he may contradict the notarial act by parol proof or any other legal evidence."

In Insurance Co. v. Harbor Protection Co., 37 La. Ann. 236, it was said:

"An acknowledgment can never be invoked to maintain a condition or state of things created in violation of a prohibitory law."

And the statement is quoted as authority, with other cases to sustain it, in Ackerman v. Larner, 116 La. 115, 40 South. 581.

Our conclusion is that, with respect to the matters thus considered, the petition states a cause of action, and that the judgment appealed from must therefore be, in part, reversed. The other exceptions were not ruled upon by the trial court.

It is therefore ordered that the judgment appealed from be affirmed, in so far as it maintains the exception of no cause of action, as addressed to the allegations concerning the ingratitude, cruel treatment, and grievous injuries on the part of Anna M. Deubler towards the testatrix, and reversed in so far as it otherwise maintains that exception. It is further ordered that the case be remanded to the trial court to be there proceeded with according to law and to the views hereinabove expressed, the costs of the appeal to be paid by the appellees, John T. Brady and Anna M. Deubler, now the wife of said Brady, and the costs of the trial court to await the final judgment to be rendered in the case.

See dissenting opinion of O'NIELL, J., 71 South. 848.

---

(71 South. 849)

No. 20408.

SWIFT & CO., Limited, v. BONVILLAIN et al.

(April 24, 1916. Rehearing Denied May 22, 1916.)

*(Syllabus by the Court.)*

1. FRAUDULENT CONVEYANCES ⬤⟹138—PROPERTY SUBJECT—EFFECT OF PLEDGE.

Save in cases especially provided by law, a contract purporting to pledge movables is ineffective unless the property is actually delivered to the pledgee, and leaves such property subject to seizure for the debts of the pledgor, whose creditors may, in cases otherwise authorized, proceed by attachment, and without resorting to the revocatory action.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. §§ 438, 443, 448–452; Dec. Dig. ⬤⟹138.]

2. AGRICULTURE ⬤⟹12—PLEDGES—LIEN—VALIDITY—TIME OF TAKING EFFECT—STATUTES.

Section 1 of Act No. 66 of 1874 authorizes a planter to pledge his growing crop as security for the debt contracted by him for advances of money and supplies required for its production, and such contract, duly recorded, vests in the factor who makes the advances constructive (equivalent to actual) possession of the crop; and sections 2 and 3 of that act declare that the pledge shall be perfect in certain cases where agricultural products are consigned, by ship or rail, etc., from the time the bill of lading is mailed or delivered to the carrier for transmission to the consignee.

[Ed. Note.—For other cases, see Agriculture, Cent. Dig. §§ 40, 41; Dec. Dig. ⬤⟹12.]

**3. AGRICULTURE ⊚⟞11—PLEDGES—LIEN—VALIDITY—GROWING CROPS.**

Under section 1 of Act No. 66 of 1874 a growing crop may be pledged for and to the extent of the debt contracted by the planter for the money and supplies advanced for its production, but no further; and, under such contract, the factor acquires no right to appropriate the proceeds of the crop, or any part of it, to the payment of any debt other than that for which it is thereby pledged, nor can the law authorizing such special contract of pledge be disregarded or circumvented, to the prejudice of the other creditors of the planter, by stipulations under cover of such contract requiring the planter to ship his entire crop to the factor, authorizing the factor to appropriate or "impute" the proceeds to the payment of any debt that may be due or may become due him, and declaring that such appropriation or "imputation" shall not impair his rights of pledge, thereby putting him in a position to appropriate the surplus of such proceeds over and above those to which his pledge extends to the payment of all debts due him, to the exclusion of debts of equal standing due to other creditors of the planter; for it is a fundamental principle of our law that the property of the debtor is the common pledge of his creditors, from which it follows that the surplus of a planter's crop (over and above the interest or proportion which may be said to be alienated by the special pledge for advances of money and supplies), being still his property, remains as part of such common pledge, in which one creditor has the same interest as another, and which cannot lawfully be appropriated to the payment of one of them when the debtor is unable to make like provision for the others.

[Ed. Note.—For other cases, see Agriculture, Cent. Dig. §§ 15–30; Dec. Dig. ⊚⟞11.]

**4. FRAUDULENT CONVEYANCES ⊚⟞121 — TRANSACTIONS INVALID—PREFERENCE.**

When a planter has shipped, or is about to ship, to his factor, a greater proportion of his crop than is, or will be, required to pay the debt (secured by pledge) for money and supplies advanced for its production, under a contract which authorizes the factor to appropriate or "impute" the proceeds to the payment of other debts due or that may become due him, and the planter is unable to make like provision for the debts due to his other creditors, he must be held to be disposing or about to dispose of his property, with intent to give an unfair preference to one of his creditors; and another creditor complaining thereof may proceed by the attachment of the surplus of the crop (to be found in so much of his crop as remains in the planter's possession) over and above that required to satisfy the pledge of the factor.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. §§ 385–391; Dec. Dig. ⊚⟞121.]

**5. ATTACHMENT ⊚⟞114 — AFFIDAVITS — SUFFICIENCY.**

Paragraph 4 of article 240 of the Code of Practice furnishes two cases disjunctively and distinct from each other in which the property of the debtor may be attached; the one where the debtor "has mortgaged, assigned or disposed of, * * * his property, rights or credits, or some part thereof with intent to defraud his creditors"; the other where the debtor has so acted "with intent * * * to give an unfair preference to some of them [meaning some of his creditors]"; and, as it is unnecessary, if not improper, when the affidavit charges the intent to defraud, to add the intent to give an unfair preference, so it is unnecessary, if not improper, when the affidavit charges the intent to give an unfair preference, to add the intent to defraud, and in neither case is it necessary to charge the insolvency of the debtor.

[Ed. Note.—For other cases, see Attachment, Cent. Dig. §§ 312–314; Dec. Dig. ⊚⟞114.]

**6. ATTACHMENT ⊚⟞249—PROCEEDINGS—EVIDENCE.**

It is only where the evidence adduced by the defendant in attachment is sufficient to rebut the prima facie case made out by the affidavit of the plaintiff that plaintiff is required to support the affidavit by evidence.

[Ed. Note.—For other cases, see Attachment, Cent. Dig. §§ 861–876; Dec. Dig. ⊚⟞249.]

*(Additional Syllabus by Editorial Staff.)*

**7. WORDS AND PHRASES—"OR."**

"Or" is defined as a co-ordinating particle making an alternative, indicating a choice of one of different things, but not of all.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Or.]

O'Niell, J., dissenting.

Appeal from Twenty-Third Judicial District Court, Parish of St. Mary; Thomas M. Milling, Judge.

Action by Swift & Co., Limited, against A. A. Bonvillain, wherein Leon Cahn & Co. claimed a privilege. From a judgment dissolving an attachment, plaintiff appeals. Reversed, and attachment maintained.

L. A. Morphy, of New Orleans, and Charles J. Boatner, of Franklin, for appellant. Borah, Himel, Bloch & Borah, of Franklin, for appellees.

### Statement of the Case.

MONROE, C. J. Plaintiff brought this suit on a promissory note for $3,056.11, of which

defendant was the maker, and which, when sued on, was past due by nearly a year. Defendant filed an exception of prematurity of action, alleging that an extension of time had been granted, but on the trial offered no evidence to support his allegation, and the exception was overruled. Thereupon, on the same day, plaintiff filed a supplemental petition making the following allegations, upon the basis of which it obtained a writ of attachment, to wit (quoting only those which are material to the issues here involved):

"That defendant is manufacturing sugar and molasses, * * * and that, as so, and when, manufactured, * * * ships, and is regularly shipping, the sugar and molasses to * * * Leon Cahn & Co., of New Orleans, La.; * * * that the said firm of Leon Cahn & Co. is also a creditor of the said A. A. Bonvillain in a sum the exact amount of which petitioner does not know; that the said shipments of sugar and molasses are being made * * * to give, and * * * do, in fact, give, to the said Leon Cahn & Co., an unfair preference over other creditors of defendant, including petitioner. Petitioner shows that its remedy herein is by attachment, and * * * that, unless such attachment issues, * * * the said A. A. Bonvillain will continue to ship the aforesaid sugar and molasses to the said Leon Cahn & Co., so as to prefer the said Leon Cahn & Co., and in fact prefer the said Leon Cahn & Co., over defendant's other creditors, including petitioner, and petitioner fears and believes and avers that by such shipments it will be left without means of recovering from said A. A. Bonvillain the aforesaid indebtedness, due by him to petitioner."

The writ of attachment was issued as prayed for, and the sheriff seized a quantity of sugar, part of it in defendant's sugar house and part loaded on cars for shipment; and thereafter Leon Cahn & Co. (upon whom plaintiff had prayed, that its petitions be served) appeared in the case by motions, and alleged that they had a privilege and right of pledge on the sugar under recorded acts of pawn and pledge, and, moreover, were subrogated to the actions and privileges of the vendors of cane, and that, under their contract with Bonvillain, they had the right to have all sugar manufactured by him shipped to them, and they reserved their right to intervene, and in the meantime desired that the sugar should be released to them on forthcoming bonds, and it was so released.

Defendant then moved to dissolve the attachment on the following grounds:

That plaintiff has obtained a writ of attachment on the allegation "that mover is shipping his sugar to Leon Cahn & Co., * * * a creditor of A. A. Bonvillain, and is thereby giving said Leon Cahn & Co., an unfair preference over other creditors of mover, including plaintiff herein, and that the allegation is false; that the writ should be dissolved, for the following reasons, to wit: That mover is shipping his sugar to Leon Cahn & Co., under agreements which are duly recorded in the records for the parish of St. Mary, * * * and which is therefore notice to plaintiff herein; that, under said agreements, mover is compelled legally to ship his sugar to Leon Cahn & Co., and that he could be compelled by injunction by Leon Cahn & Co. to ship said sugar to it; that said agreements are dated December 13, 1912; * * * that, in addition thereto, the said sugar is pawned and pledged to Leon Cahn & Co. under an agreement duly recorded; that the sugar in the S. P. car, when seized, had already been consigned to Leon Cahn & Co.; that, in addition thereto, the said Leon Cahn & Co., has paid for all cane purchased by A. A. Bonvillain from outside parties, and has been subrogated to the actions and privileges of the vendors of the cane, both by conventional and legal subrogation; that plaintiff herein had actual notice of the agreement between A. A. Bonvillain * * * and Leon Cahn & Co. and of the fact that Leon Cahn & Co. had a privilege, pawn, and pledge on said sugar, and was entitled, under its contract, to have said sugar shipped to it, and that therefore the affidavit upon which the writ of attachment herein issued was made in bad faith; that for the past two months mover herein has been negotiating with all of his creditors, including Swift & Co., with a view of paying a certain percentage on his claims and to have the balance extended for one and two years, and that this was conditioned upon all of his creditors accepting the proposition; that this settlement contemplated the shipment of all sugar to Leon Cahn & Co.; that under the agreement such shipment was necessary, and that the proposed cash payment would only be made after sugar was shipped and Leon Cahn & Co. settled with; that the plaintiff herein was cognizant of all this, and knew, when it made this affidavit, that no effort was being made to dispose of the sugar out of due course, or for the purpose of defrauding any one, but to carry out a proposition which it had accepted."

Some days later defendant filed an exception to the effect that the supplemental petition disclosed no right or cause of action for the issuance of an attachment, which ex-

ception was overruled, but which, by answer to the appeal, defendant now urges.

On the trial of the motion to dissolve there were filed in evidence several contracts between defendant and Cahn & Co., and considerable oral testimony was admitted, and other such testimony excluded. The contracts are as follows:

January 11, 1911, defendant gave his notes for $100,000, and Cahn & Co. agreed to advance that amount, including balance then due, for the making and manufacturing of the crop of 1911–12, the growing crop being pledged to them and defendant agreeing to ship the products to them ,when ready for market.

January 10, 1912, defendant gave his notes for $60,000, secured by mortgage and confession of judgment, in reimbursement of moneys loaned and advanced, with the agreement that no portion of the (proceeds of) crops and produce shipped by the mortgagor should be imputed to the payment of said notes.

March 27, 1912, Cahn & Co. agreed to advance $50,000 for the making and manufacturing of the crop of 1912–13, and defendant gave his two notes of $25,000 each, secured by mortgage importing confession of judgment, and by pledge and pawn of said crop, as authorized by Act 66 of 1874, and it was further agreed (quoting the language of the contract):

"That said Leon Cahn & Co. shall have the exclusive right to apply the net proceeds of sales of all products shipped and all payments of money made to them by said party of the first part to the payment of any indebtedness which may now be due or which may hereafter become due to them by said party, * * * whether on open account or otherwise, according to said Leon Cahn & Co.'s view of the exigency of the case; that such application may be made at such time and in such manner as said Leon Cahn & Co. may elect; that no application of such proceeds of sale or of money to the payment of any debt due on open account or otherwise which may at any time be due to said Leon Cahn & Co. by said party of the first part shall impair, lessen, or prejudice the indebtedness secured by these presents; and that said Leon Cahn & Co. shall have the undisputed right to impute payment, as they determine, to whatever debts may be due them by said party of the first part," etc.

December 12, 1912, Bonvillain declared that he needed $10,000 more "to complete the operation of harvesting and manufacturing his cane into sugar and syrups, as well as the cane purchased from tenants and others and manufactured at his said factory," and Cahn & Co. agreed to advance that amount, in order to secure which Bonvillain, in addition to the privilege accorded by law to Cahn & Co. as advancers of supplies, specially pledged and pawned in their favor all sugars manufactured "at the factory of said A. A. Bonvillain on his home place plantation * * * in Cypremort, * * * and especially all the third sugars, masse-cuite and molasses manufactured from said crop," said Cahn & Co. being authorized to "sell said products in due course and credit the proceeds * * * to the payment of the sums advanced under the agreement after having deducted the usual commission and brokerage."

December 30, 1912, Cahn & Co. agreed to make advances to the extent of $75,000 for the making and manufacturing of the crop of 1913, for which amount they received the note of A. A. Bonvillain and certain of his major children, secured by mortgage on the real estate and pledge of the crop; it being further agreed (as in the contract of March 27, 1912) that Cahn & Co. should have the right to impute all moneys and proceeds received by them to the payment of any debt due to them, whether on open account or otherwise, as they might elect.

October 13, 1913, the firm of Leon Cahn & Co., composed of Leon Cahn and Leon Pfeiffer, agreed to make advances to A. A. Bonvillain to the extent of $75,000 for the harvesting and manufacturing of the crop of 1913, for which amount Bonvillain gave his note, secured by the privilege for advances accorded by law, and by the pledge and

pawn; it being further agreed, as in the previous contracts, that imputations of payment should be left entirely to the election and discretion of Cahn & Co.

Concerning his indebtedness to, and the state of his account with, Cahn & Co., Mr. Bonvillain gave the following, with other, testimony:

"Q. Do you recall, in round figures, the amount of your indebtedness to Leon Cahn & Co. prior to the execution of the contract of December 12, 1912? * * * A. No, sir; I don't. * * * Yes; I recollect that I was indebted to them to a certain extent. Q. But you don't recall, even in round numbers the amount? A. No, sir. Q. Do you recall for how long a time, prior to December 12, 1913, you had been indebted unto Leon Cahn & Co.? A. I got somewhat indebted to him in the crop of 1911 by losing the best part of the crop. * * * Q. If I understand you correctly, you first began to be more heavily involved with Leon Cahn & Co. about the 1st of January, 1911? A. No, sir. Q. 1912? A. Yes, sir. * * * Q. I understood you to say the crop of 1912 was a losing crop? A. Yes; it was short. Q. That is you lost money in 1912? A. Yes, sir. Q. But you don't recall how much? (Objection and ruling.) A. No, sir. * * * Q. In other words, you lost money on the crop running from January 1, 1911, to January 1, 1912, and also lost money on the crop running from January 1, 1912, to January 1, 1913? A. I didn't state that sir; I don't think we will lose any money this year. [He was testifying on December 15, 1913.] Yes, sir; we lost money in 1911 and 1912. Q. You don't recall, though, what the loss was in either of those years? A. No, sir. Q. Cahn & Co. were your factors during those years? A. Yes, sir. * * * Q. You stated, Mr. Bonvillain, that you did not know in what sum you were indebted to Leon Cahn & Co.; therefore I presume you are not in a position to state whether or not the shipments that have been made to Leon Cahn & Co. from your place during the year 1913 have either extinguished any privilege indebtedness * * * or whether they have extinguished the total indebtedness? (Objection and ruling. Question read by stenographer.) A. They have not extinguished the total privilege indebtedness. Q. In your answer as to the privilege indebtedness what do you mean when you say that they have not extinguished the privilege indebtedness? A. I mean to say the privilege indebtedness is usually drawn up for an amount that Mr. Cahn would be called on to pay for my account, and that I have not repaid him the full amount of that indebtedness. Q. In other words, your answer means that you state that you have not extinguished your total account with Leon Cahn & Co.? A. Yes, sir; exactly. Q. And by privilege indebtedness you mean total indebtedness? A. Yes, sir. Q. I don't, Mr. Bonvillain, desire to seem to ask you any unfair or suggestive questions, but I do ask how you find that you are able to state that your total account with Leon Cahn & Co. has not been extinguished, when you have previously stated that you didn't know and couldn't tell how the account stood? A. I mean, in a general way, I couldn't tell how it stands, now, but I know I have not finished paying Mr. Cahn. Q. You mean, when you say you haven't finished paying him, that you still owe him on the account that you have been owing Leon Cahn during these years he has represented you, and which indebtedness begins with your indebtedness in 1911? A. No, sir; I am not talking about that; I am talking about the 1913 indebtedness. Q. You mean to say that you have not yet shipped, or that your crop of 1911 [1913] will not more than defray all advances, or all sums lent you by Leon Cahn during the year 1913? A. I didn't state that. We are not finished grinding yet. We are still making sugar; and you must understand that we bought a whole lot of cane, and Leon Cahn & Co. furnished the money and paid for this cane, and that took considerable money. (Objection by defendant's counsel. No ruling.) Q. Is there any one, Mr. Bonvillain, in your employ or on your place who would be able to tell us exactly how your account stands with Leon Cahn & Co.? A. No, sir; I don't believe."

Plaintiff obtained an order for a subpœna duces tecum directing defendant to produce certain books of account, papers, etc., showing the total indebtedness due to Leon Cahn & Co. for advances in 1913, the quantity of sugar shipped to that firm; the amount realized therefrom, and the balance, if any, then due; the number of tons of cane ground at the home place factory; the number produced on the defendant's plantations; the number bought elsewhere; the dates of purchases and shipments, and the receipts of the sellers for the price; the daily tonnage ground, and the daily yield of sugar. It was alleged in the application for the writ that plaintiff would be able to show by the books, papers, etc., thus called for that the shipments to Cahn & Co. had been more than sufficient to reimburse the advances made for harvesting and manufacturing the crop of 1913, that defendant had bought at least 40 per cent. of the cane ground by him, and had ground it confusedly with that raised by him, and

that the proportion of sugar to tonnage is not constant.

Defendant made a return declining to produce the books, papers, etc., on the ground that the facts which it was alleged could be established were immaterial, and could not be inquired into on the trial of the motion to dissolve the attachment; the only matter put at issue by the motion (as he alleged) being "the fraudulent intent of mover herein in shipping his sugar to Leon Cahn & Co. so as to give an unfair preference over the other creditors of mover."

Counsel for plaintiff made a verbal request that the facts sought to be proved be taken for confessed, but it does not seem to have attracted the attention of the court, and no action was taken on it or exception reserved.

Counsel offered to prove by defendant's bookkeeper, his sugar maker, and his shed foreman: (1) That defendant had already shipped 4,500,000 pounds of sugar to Cahn & Co., and that the total crop would exceed 6,000,000 pounds, exclusive of third sugars and molasses; (2) that about 40 per cent. of those products was produced from cane which had been purchased, and not raised, by defendant; (3) that the 40 per cent. of cane so purchased was ground confusedly with that raised by defendant; (4) that in the sugar attached it would be impossible to say how much was made from the purchased cane and how much from that which had been raised by defendant; (5) that the shipments already made to Cahn & Co. at the date of the attachment more than discharged any privileged indebtedness to them; (6) that the shipments made and to be made would more than discharge the total indebtedness of Bonvillain; (7) that Cahn & Co. loaned or agreed to loan Bonvillain money wherewith to buy the 40 per cent. of cane referred to and are pretending to assert a privilege therefor, under the contracts of De-cember 12 (30), 1912, and December (October) 13, 1913, and that they have no such privilege. The court ruled that he would be permitted to prove the facts stated under Nos. 1, 5, and 6, but with reference to the others said:

"The court's reasons for refusing this tender are: * * * That going into the question of whether or not 40 per cent. of the cane was purchased and ground confusedly with the cane grown by Mr. Bonvillain, and attempting to determine whether or not Leon Cahn & Co. lost any privilege that they might have had for that reason, would be determining the rights of parties not before the court and investigating a question upon which the court could render no valid judgment, and, in the court's opinion, would be considering matters not relevant to the issues of this motion. The allegations of the petition are that A. A. Bonvillain is shipping sugar to Leon Cahn & Co.; that this shipment is for the purpose of and does in fact give Leon Cahn & Co. an unfair preference over other creditors. There is no allegation that the giving of a lien and privilege to Leon Cahn & Co. was giving an unfair preference to them as creditors, nor is there any allegation in the petition with reference to the confused grinding and shipment of cane, and such giving of liens and privileges on grinding of purchased and grown cane are not alleged as the basis of an unfair preference. While it is true that the supplemental petition, asking for the attachment asks for service on Leon Cahn & Co., yet there was no prayer for any kind of judgment against Leon Cahn & Co. or any relief prayed for against them, and, as they have not answered nor made any appearance in this matter, the court cannot consider them parties to the motion."

Counsel for plaintiff then asked for a continuance in order to give him an opportunity to obtain the testimony of the members or employés of Cahn & Co., which request, on the objection of defendant, was denied. It was developed on the trial of the motion that in February, 1913, defendant, through counsel, had requested plaintiff to extend the time for the payment of the note sued on for another year, and that his request had been refused, that he thereafter endeavored to prevail upon his creditors to grant him an extension or respite, his proposition to them being that he would pay on or before February 1, 1914, 40 per cent. in cash, and the balance of his indebtedness in one and two years, and that, not succeeding in ob-

taining the consent of all his creditors, the attempt failed. According to a letter written by his counsel, he owed $15,000 or $20,000 on open account, and "it would have required the closest economy in figuring to raise the 40 per cent." and the proposition, as made, was the best that he was able to make.

Plaintiff was one of the creditors whose consent to the extension was withheld, and, as Cahn & Co. were taking some part in the matter, it offered to sell its claim to them, which offer was considered, but not accepted. There was judgment dissolving the attachment, and plaintiff has appealed.

### Opinion.

The contentions upon which the learned counsel for defendant rely in support of their view that there was no warrant for the issuance of the attachment are interpreted by us as follows (stating them in somewhat different order from that in which they have been argued):

That the contract between defendant and Cahn & Co. was valid, was the law between the parties thereto, and, until abrogated, demanded and was entitled to execution, and hence that defendant was bound thereunder to ship his entire crop to Cahn & Co., and Cahn & Co. were entitled thereunder to impute the proceeds to the payment of any debt that might be due them.

That, if any unlawful preference was given, it was given by the contract, and not by the shipment, or proposed shipment, of sugar in execution thereof, and hence that such execution could not be obstructed without a direct attack upon the contract.

That no attack is made upon the contract, and could not be made, save upon allegations of fraud and of the insolvency of the defendant, and that plaintiff makes no such allegations.

That an attachment cannot be issued under paragraph 4 of article 240 of the Code of Practice, upon a charge of an intent to give an unfair preference, without also alleging an intent to defraud and the insolvency of the debtor, and that plaintiff's petition does not so allege.

That, upon the trial of the motion to dissolve the attachment, the burden of proof was thrown upon plaintiff, and was not sustained.

[1] The view that we take of those contentions is as follows: Plaintiff was not a party to the contract between defendant and Cahn & Co., is not bound by it, makes no attack upon it, and was under no obligation to do so. Its action is founded in the principle of our law that the property of the debtor is the common pledge of his creditors, and the remedy that it seeks is provided by the Code of Practice, which declares that:

"Art. 240. A creditor may obtain such attachment of the property of his debtor, in the following cases: * * *
"4. When he has mortgaged, assigned or disposed of, or is about to mortgage, assign or dispose of his property, rights or credits, or some part thereof with intent to * * * give an unfair preference to some of them [some of his creditors]."

Proceeding under the law thus quoted, plaintiff procured the attachment of a portion of certain movable property which belonged to its debtor, was in his possession, and of which (as plaintiff alleged) he was in the act of disposing in order to give an unfair preference to some other of his creditors. If the facts be as thus stated and alleged, the case is clearly within the terms of the law, which declares the case thus stated to be one of those in which an attachment may issue, and it is immaterial whether defendant was acting, and was about to act, as alleged, by reason of, and in conformity to, a previous understanding or contract, or upon the impulse of the moment, and without such understanding; for, if an attachment cannot issue in any case where the debtor is disposing or is about to dispose of his property with intent to defraud or give an unfair preference, provided

there was a previous understanding to that effect, the law, which declares that an attachment may issue in such cases, is practically a dead letter, since transfers of property are seldom made inter vivos to those who have not been previously informed and have not previously acquiesced in the intention to make them. Defendant's counsel call attention to our jurisprudence to the effect that, where one has acquired the ownership and possession of property, whether movable or immovable, by a real contract, even though fraudulent, the title cannot be attacked collaterally by attachment, but that the attack must be made through a direct action for the revocation of the contract, and that it is only where the contract is merely simulated that the person complaining can proceed by attachment; and we concede that there is such a jurisprudence, though we do not find it necessary at this time to enter into any extended discussion of the law or reasoning upon which it is founded. It is enough to say that neither has any application to a case in which, as between a debtor and his creditor, the title to the property attached is vested in no other person than the debtor, and the debtor is in possession, even though, as between the debtor and another person, there may be a contract which vests the title in the latter, or to a case in which there is a contract between the debtor and one creditor, whereby the latter has acquired a right with respect to the property of the former as security for a particular debt, and another creditor proceeds merely with reference to the surplus that may be found after the payment of the debt. Thus immovable property may be attached by the creditors of the vendor so long as the sale has not been recorded. First National Bank v. Ft. Wayne Ice Co., 105 La. 133, 29 South. 379.

"The sale or assignment of movable property without delivery is void as to third persons." 2 Hen. Dig. 1341, B; Hill v. Hanney, 15 La. Ann. 654; C. C. arts. 1992, 2247.

"A consignee's claim for advances is superior to that of an attaching creditor, where the former has received the bill of lading previous to the attachment. But proof of such advances will not defeat the attachment of the latter who will be entitled to any surplus after payment of the advances and necessary expense." 1 Hen. Dig. p. 136, (b) No. 2.

"Factors * * * cannot claim a lien on * * * moneys or property for a general balance of account against the owner over an attaching creditor." Gray v. Bledso, 13 La. 491.

A pledge is, under all systems of law, a real contract; a delivery of the thing is not a consequence, but the very essence of the contract. Lee v. Bradlee, 8 Mart. (O. S.) 57; C. C. art. 3158.

An unexecuted promise to deliver a certain collateral as security gives no privilege or pledge to the creditor. Succession of D'Meza, 26 La. Ann. 35.

The fact that a thing is held in pledge by one creditor, who is empowered to sell it, does not prevent other creditors of the pledgor from seizing the thing in the hands of the pledgee and having it sold, subject to the pledgee's claim. Augé v. Variol, 31 La. Ann. 865; Renshaw v. His Creditors, 40 La. Ann. 41, 3 South. 403.

It requires no citation of authority to sustain the proposition that an ordinary creditor may cause the property of his debtor, standing in his name and being in his possession, to be seized under either mesne or final process, though it be covered with registered privileges and mortgages, and is entitled, by virtue of such seizure, to whatever surplus the property may yield after the privileges and mortgages are satisfied; the rights of the holders thereof being usually asserted by them, and not by the debtor.

[2] The defendant debtor now before the court sets up his contract with Cahn & Co. as furnishing the reason why the attachment should be dissolved and yet his counsel assert that plaintiff should not be permitted to question the contract, because (it is said) Cahn & Co. (whom the counsel also represent)

have not thus far thought proper to make themselves parties to the proceeding. Cahn & Co. have obtained the release of the seized property by filing two motions, in which they set up rights of privilege, pledge, and pawn under the contract in question, and the property has been released to them on forthcoming bonds given by them, which could only have been done upon the theory that they had intervened (by their motions) under the authority of Act 51 of 1876. We have no doubt, therefore, that they have made themselves parties to the proceeding, and, while they would have no standing to object to the attachment for matters that concerned the defendant alone, they were not, and could not have been, denied the privilege of asserting upon the hearing of the motion to dissolve any rights affected by the attachment which were peculiar to themselves. Pretermitting, however, the question, whether Cahn & Co. are before the court for the purposes of the issues here presented and the decision to be herein rendered, it seems quite certain that defendant, as plaintiff in the rule to dissolve, is before the court, and equally certain that the court is bound to inquire into the sufficiency of the reasons which he assigns for the dissolution of the attachment, and which are said to be (in part at least) furnished by his contract with Cahn & Co. The contract in question purports to pledge defendant's crop of the year 1913 for advances to be made by Cahn & Co. for its production, and to bind defendant to ship the entire crop to Cahn & Co., to be sold by them upon the usual commission, and it contains a stipulation (quoted in the preceding statement of the case) authorizing Cahn & Co. to impute the proceeds at any time to any debt, whether on open account or otherwise, that defendant owed or might thereafter owe them; and the contention now is that, as defendant has thus bound himself, so also, quoad the crop, every one else who may have an interest in it

as part of his assets is bound. We take it, however, that the mere existence of an ordinary contract between a debtor and one of his creditors to the effect that the former will turn his assets or any given part of them over to the latter, to be imputed to the payment of any debt that the creditor may choose to select, would hardly be sufficient (and particularly if the assets forming the subject of the contract consist of movable property) to prevent other creditors from seizing them. If, therefore, the contract invoked by defendant is to be given the effect attributed to it, it must be something out of the ordinary; that is to say, it must be founded in some special law, as well as in the consent of the parties. And defendant's counsel, appreciating that view of the matter, invoke also Act 66 of 1874 as the special law upon which they rely. That law, so far as it need be here quoted, reads as follows (italics by the court):

"Section 1. * * * That in addition to the privilege now conferred by law, any planter or farmer may pledge or pawn his growing crop * * * *for advances in money, goods and necessary supplies that he may require for the production of the same,* by entering into a written agreement to pledge the same and having the agreement recorded in the office of the recorder of mortgages of the parish where said * * * product is produced, which recorded contract shall give and confer *on the merchant or other person advancing money, goods and necessary supplies for the production of said agricultural product, a right of pledge* upon the said crop, the same as if the *said crop had been in the possession of the pledgee.* * * *

"Sec. 2. * * * That when any merchant * * * *has advanced money, property, or supplies on cotton, sugar or other agricultural products,* and the same has been consigned to him by ship, * * * railroad or other carrier, the said agricultural products *shall be pledged to the consigner thereof from the time the bill of lading thereof shall be put in the mail, or put into the possession of the carrier for transmission to the consignee.* * * *

"Sec. 3. * * * That all merchants * * * who may have a general balance of account, or any sum of money due them by any consignee [consignor] or other person sending them cotton, sugar * * * for sale * * * *shall have a pledge upon all such property* * * *from the time the bill of lading or receipt therefor*

*by the carrier is deposited in the mail or given to the carrier for transmission.* * * * "

The privilege "now conferred by law" to which reference is made in the above-quoted section 1 is that conferred by article 3217 of the Civil Code, which declares that:

"The debts which are privileged on certain movables are the following:

"1. The appointments or salaries of the overseer for the current year, on the crops of the year and the proceeds thereof; debts due for necessary supplies furnished to any farm or plantation, and debts for money actually advanced and used for the purchase of necessary supplies and the payment of necessary expenses for any farm or plantation, on the crops of the year. * * * 4. The debt on the pledge which is in the creditor's possession."

Construing the article thus quoted with section 1 of the act, it will be seen that the article confers a privilege upon the crop of the debtor for debts incurred for necessary supplies furnished and money actually advanced and used for paying for such supplies and in payment of necessary expenses of the plantation upon which the crop is produced and while being produced; but, as the article is by its terms confined in its application to "debts which are privileged on movables," and as "standing crops" are immovables, it would seem to follow that the privilege so conferred is intended to take effect only upon the severance of the crop from the soil.

[3] Section 1 of the act therefore provides as a further security to the furnisher of the money and supplies required and used for the production of the crop that the planter may pledge his "growing crop" for such money and supplies by written contract duly recorded, and that the recorded contract shall have the effect of actual delivery of the property to the pledgee, which actual delivery would otherwise be indispensable to the completion of the contract, whether it be regarded as in the nature of an antichresis or a pawn. But the section does not give to a mere convention inter partes (whether recorded or not) purporting to secure an ordinary debt by pledge of a crop, whether growing or otherwise, when unaccompanied by actual delivery, the effect of a pledge; hence, in so far as it may be so intended, it falls under the general law governing the contract of pledge and requiring actual delivery of the property (C. C. arts. 3158, 3181), and is void upon its face, and hence, also, the contract here set up by defendant would be void upon its face if and to the extent that, under cover of a pledge for money and supplies for the making of the crop of 1913, it attempted to secure by pledge of that crop a debt contracted by defendant for any other purpose, and is void as to all other creditors of defendant in so far as it purports or is construed to give Cahn & Co. any right or privilege on the crop by authorizing them to impute the proceeds thereof to the payment of any other debt. In other words, Cahn & Co. were pledgees of the crop under section 1 of the act of 1874 to the extent of their advances for its production, and no farther, and the surplus of the crop over and above the proportion required to reimburse those advances remained and was bound to remain the common pledge of all the creditors of Bonvillain, and its status could not be so changed as the result of any contract between Bonvillain and Cahn & Co. authorizing Cahn & Co. to appropriate it to the payment of ordinary debts due to them as to prevent plaintiff, or any other creditor of Bonvillain, from proceeding against it by attachment so long as it remained in the possession of Bonvillain and so long as he was shipping or about to ship it to Cahn & Co. to be so appropriated by them.

As a matter of fact, Cahn & Co. were better advised than to make any direct attempt to subject the crop to a pledge for the security of any debts due or to become due them by Bonvillain, other than those represented by the notes of December 30, 1912, and October 13, 1913, both of which are declared in

the contracts to have been given for advances to be made for the making, harvesting, and manufacturing of the crop, and the stipulation in each contract for the pledge of the crop is confined in its application to the advances thus mentioned. There is therefore nothing in the contract or contracts set up by defendant (the contract of December 30, 1912, being more particularly referred to in the argument) to sustain the contention that Cahn & Co. had any special interest in the seized sugar beyond the pledge for the reimbursement of their advances for the making of the crop, except the bare stipulation concerning the imputation of payment from the proceeds of the sale of the crop which purports to give them the right to appropriate those proceeds to the payment of the ordinary debts due or to become due to them, as well as to the reimbursement of their advances, either or both, at their discretion.

[4] Whatever surplus, however, over and above the amount required the crop may have yielded at the time of the attachment, or was about to yield, was the common pledge of Bonvillain's creditors, and it was with reference to that surplus that plaintiff caused the attachment to issue; his complaint being, in effect, that the common debtor was disposing of it in shipping his entire crop to Cahn & Co. under a contract which was intended to authorize Cahn & Co. to appropriate the entire proceeds, including whatever surplus there might be, to the payment of the debts due to themselves, including ordinary debts as well as the debt for which the crop and proceeds were pledged, and that in so doing defendant was disposing, and was about to dispose, of his property with the intent to give an unfair preference to Cahn & Co.

In his motion to dissolve the attachment defendant, as we have stated, alleges:

"That mover herein is shipping his sugar to Leon Cahn & Co. under agreements duly recorded; * * * that under said agreements mover herein is compelled legally to ship his sugar to Leon Cahn & Co., and that he could be compelled by injunction by Leon Cahn & Co. to ship said sugar to it; * * * that, in addition thereto, the said sugar is pawned and pledged to Leon Cahn & Co. under an agreement duly recorded; that the said sugar in the S. P. car, when seized, had already been consigned to Leon Cahn & Co.; that, in addition thereto, the said Leon Cahn & Co. has paid for all cane purchased by A. A. Bonvillain from outside parties, and has been subrogated to the actions and privileges of the vendors of cane by both conventional and legal subrogation."

The contract (of December 30, 1912) recites that Cahn & Co. agree to make advances for the crop of 1913 to the extent of $75,000 for which Bonvillain and others give their note, and that, in order to secure the payment of the note, they do—

"specially pledge * * * the entire crop * * * grown and manufactured during the said current year, * * * which crop the said parties * * * bind themselves to ship * * * to said Leon Cahn & Co., who shall dispose of the same in the regular course of business; * * * the said parties of the second part * * * recognizing in favor of Leon Cahn & Co. and all future holder or holders of said note all the liens and privileges granted by law to furnishers of money, provisions, and supplies, and particularly by Act No. 66 of 1874, and consenting and agreeing that said laws be especially applied to these presents, and all benefits thereof conferred on and employed by said firm of Leon Cahn & Co. * * * It is furthermore agreed," etc.

And then follows the stipulation concerning the imputation of payments, copied in the preceding "statement of the case."

Mr. Bonvillain, having been called as a witness in support of the motion to dissolve the attachment, was subsequently recalled for cross-examination under Act 126 of 1908, and gave the following, with other, testimony, to wit:

"Q. In your answer as to the privilege indebtedness what do you mean when you say that they [his previous shipments of sugar to Leon Cahn & Co.] have not extinguished the privilege indebtedness? A. I mean to say the privilege indebtedness is usually drawn up for the amount that Mr. Cahn would be called on to pay for my account, and that I have not repaid him to the full amount of that indebtedness. Q. In other words, your answer means that you state that you have not extinguished your total account with Leon Cahn & Co.? A. Yes, sir;

exactly. Q. And by the privilege indebtedness you mean the total indebtedness? A. Yes, sir."

Defendant's counsel in their briefs urge the contract between defendant and Cahn & Co. as an insuperable obstacle to the proceeding by attachment, saying that it pledged defendant's entire crop to Cahn & Co. and bound defendant to ship it to them, and that they were to dispose of it and be entitled for those services to the usual brokerage and commission, and that:

"It is further provided that Leon Cahn & Co. shall have the exclusive right to impute the net proceeds from the sale of said sugar and molasses to the payment of any debt or open account which the said Bonvillain might owe when said sugars were sold. Now, it was under this contract that Bonvillain was shipping and disposing of the sugar at the time the attachment was run."

There can be no manner of doubt, therefore, that, although the crop was pledged to Cahn & Co. only for the reimbursement of their advances for the crop of 1913, it was shipped, being shipped, and to be shipped to them under an agreement and with the intention that upon selling it they should be at liberty to appropriate the proceeds either to the payment of the debt due for advances or to the payment of any ordinary debt due or to become due them, and that, in the event of their first paying themselves such ordinary debts as they might select, the pledge securing the debt for advances should remain intact as to the balance of the proceeds. And yet the best offer that defendant could at that time make to his other ordinary creditors was 40 per cent. on the dollar cash, and the balance in one and two years. If, therefore, there was or was to be, a surplus from the proceeds of the crop beyond the amount for which the crop was pledged, it was placed at the disposal of Cahn & Co., not as pledgees, but, as ordinary creditors, from which it seems clear enough that Cahn & Co. were intended to be given a preference over defendant's other ordinary creditors with respect thereto. We make the following excerpts from the opinion in the case of Minge v. Barbre, 51 La. Ann. 1290, 1295, 26 South. 182, 184, as to some extent applicable to the situation as thus presented, to wit:

"It may with truth be said that for a debtor to give a preference to one creditor over another is not in itself wrong, and is not a fraud in a moral sense, since it is permitted in many of the states of the Union, but that does not help the matter so far as this case is concerned. With us the property of the debtor is the common pledge of his creditors, and any arrangement, whether through the machinery of the courts or otherwise, whereby the debtor unites with one creditor to give such creditor an advantage over others, is in violation of the prohibitions of the law, and will not be [tolerated]. Newman v. Baer & Levy, 50 La. Ann. 323 [23 South. 279]; Block v. Marks, 47 La. Ann. 107 [16 South. 649]; Simon & Co. v. Newman, 50 La. Ann. 338 [23 South. 329]; Haas v. Haas, 35 La. Ann. 885; Muse, Syndic, v. Yarborough, 11 La. 521; Civil Code, arts. 1969, 1970, 1977, 1983, 1984, 2053. * * *

"We think it a reasonable proposition that privileges should be restricted within the limits fixed by the law and by the parties themselves. If Barbre had intended to secure a greater sum than $2,500, or if Minge & Co. had intended to advance more than that amount, and wanted the additional advances to be secured by the privilege by which the $2,500 was secured, it is fair to suppose that such intentions would have been expressed in the contract into which they entered. As it is, Minge & Co. were secured to the amount expressed in the contract, to wit, $2,500, and the whole crop to make which the money advanced was used remained pledged to them up to the time that it yielded them that amount, when their right of pledge was exhausted. Gay & Co. v. Pike, 30 La. Ann. 1332."

See, also, Bank of Patterson v. Urban Co., La., 114 La. 788, 38 South. 561; Levert v. Berthelot, 127 La. 1018, 1019, 54 South. 334.

In the case last above cited it was said:

"The company intervening claimed in its petition of intervention the sum of $14,000, secured by pledge duly inscribed. The company is entitled to the whole of the advances made by it which were used in cultivating and gathering the crop. A part of the advances we will see later, was not so used. * * *

"Although it was the agreement that this sum would be advanced as before stated, the defendant, with the consent of the interveners, used an amount of $4,729.19, with which defendant paid another debt; that is, interveners, instead of paying themselves and satisfying their claim, permitted the defendant to pay another debt not

secured by pledge or privilege on the crop. Having received the crop to an amount sufficient to pay their claim, they must be charged in this settlement with the amount received, which went to the payment of an unsecured claim."

Defendant alleges in his motion to dissolve that the sugar seized on the S. P. cars had already been consigned to Cahn & Co. He does not allege, nor did he attempt to prove, that any bills of lading for the sugar so seized had been mailed or delivered to the carrier for transmission to Cahn & Co., and it is only under such conditions that any right of pledge would arise from the consignment. Act 66 of 1874, §§ 2, 3.

Defendant also alleges, in his motion that Cahn & Co. paid for all the cane purchased by him from outside parties, and that they have been subrogated to the rights of the sellers with respect to the price; but neither he nor Cahn & Co. made any attempt to prove the subrogation.

If, then, movables which have been sold, but not delivered may be attached by a creditor of the vendor, because as to him there was no sale, so movables which have been pledged without delivery may be attached by a creditor of the pledgor, because as to him there was no pledge; and a fortiori, where movables, constituting the surplus of a mass pledged only to a certain extent over and above the requirements of the pledge remain in the possession of the pledgor, they may be attached by a creditor of the pledgor.

Finally (upon the point under consideration), Act 46 of 1886, amending and reenacting C. P. art. 398 declares;

"That, in all cases where personal property is seized upon mesne or final process, and is claimed by a third opponent, the seizing creditor may be allowed in his answer to the third opposition to allege and prove his title fraudulent, and the court shall try and decide the issue thus made."

[5] In the original brief of the learned counsel for defendant we find the following, referring to C. P. art. 240, to wit:

"Section 4 of the article provides that a disposition of the property which is intended to give 'an unfair preference to some of' the creditors must be made with intent to defraud; in other words, that the mere shipping and selling of sugars in due course to one who happens to be a creditor in itself, under the statute, though it give to that person an advantage or preference, does not justify an attachment, unless the intent to defraud by the transaction is alleged and shown."

The article in question, as we have seen, reads (so far as here applicable) as follows:

"Art. 240. A creditor may obtain such attachment of the property of his debtor in the following cases: * * *

"4. When he has mortgaged, assigned or disposed of, or is about to mortgage, assign or dispose of, his property, rights or credits, or some part thereof with intent to defraud his creditors or give an unfair preference to some of them."

The pertinent allegations of plaintiff's supplemental petition are:

"That the said shipments * * * are being made to the said Leon Cahn & Co. with intent to give, and petitioner alleges that such shipments do, in fact, give, to the said Leon Cahn & Co., an unfair preference over other creditors of the defendant, including petitioner; * * * that the said A. A. Bonvillain will continue to ship the aforesaid sugar and molasses to the said Leon Cahn & Co. so as to prefer the said Leon Cahn & Co., and, in fact by such shipments prefers the said Leon Cahn & Co., over defendant's other creditors, including petitioner, and petitioner fears and believes and avers that by such shipments it will be left without means of recovering from the said A. A. Bonvillain the aforesaid indebtedness due by him to petitioner."

It would appear from the language of the statute that the lawmaker was of opinion that the intent of the creditor to defraud all his creditors might be disclosed in some cases, whereas in others there might be found only an intent to give an unfair preference to some of them, and, as in, perhaps, most of our sister states, one or more creditors may lawfully be preferred, it appears to us that the framers of the Code of Practice intended to deal with it merely as a thing to be regarded the giving of such preference merely discountenanced by our law, but not necessarily implying any fraudulent

purpose, and that they therefore connected it with the intent to defraud disjunctively, and in a manner to distinguish them the one from the other.

[7] The lexicon informs us that the word "or" is a co-ordinating particle—

"that makes an alternative; as, you may read or write, that is, you may do one of those things, at your pleasure, but not both. It often connects a series of words or propositions presenting a choice of either; as, he may study law or medicine or he may go into trade," etc. Web. New Inter. Dic.

And it is familiar doctrine in criminal jurisprudence that offenses denounced disjunctively must be charged either separately or conjunctively, since the disjunctive charge is bad for uncertainty, meaning that the offenses are distinct and cannot be charged in the alternative. If, then, the allegation of the intent to defraud his creditors is sufficient under the article here in question, why is not the allegation of the intent to give an unfair preference to some of them equally so, since the first paragraph of the article declares that an attachment may be obtained "in the following cases," and the disposing of property with intent to give an unfair preference is a case which follows, just as the disposing of property with intent to defraud is such a case, though not the same case.

The authorities to which we have been referred as supporting the view of defendants' counsel as to the question under consideration do not perform that function, but are inapplicable.

In Ferguson v. Chastant, 35 La. Ann. 339, the intent to defraud was charged, but the court held that it was not sustained.

Bloch v. Creditors, 46 La. Ann. 1334, 16 South. 267, was to the same effect; i. e., that fraud, having been charged, must be established.

In Poitevent & Co. v. Standard, etc., Co., 49 La. Ann. 72, 21 South. 194, defendant was charged with disposing of its property "with intent to defraud its creditors or give an unfair preference to some of them." The court held that no fraud was established and the question of unfair preference was apparently neither presented nor considered.

In Abel & Bach v. Duffy, 106 La. 262, 30 South. 834, it was held that no intent was shown "to defraud * * * or give an unfair preference."

Fidelity & Deposit Co. v. Johnston, 117 La. 880, 42 South. 357, is equally irrelevant.

In their supplemental brief the learned counsel say:

"Pretermitting for the sake of argument the question, whether or not it is necessary to allege that this was done with intention to defraud, it is necessary to allege that the debtor was insolvent and had no other property out of which this debt could be satisfied. C. C. arts. 1970, 1971."

The two articles thus cited are the first under the title "Of the Action of the Creditors in Avoidance of Contracts, and Its Incidents." Article 1970 declares that the law gives to every creditor and to the representative of all the creditors "an action to annul any contract made in fraud of their rights." And article 1971 declares that "this action" can only be exercised where the debtor has not property sufficient to pay the debt of the complaining creditor, or of all his creditors, where there has been a cession or analogous proceeding. The inability of the debtor to pay is therefore a condition precedent to the exercise of the particular right of action thus conferred.

In the case under consideration, on the other hand, the plaintiff is not seeking to annul any contract, and the law under which he is proceeding no more requires him to allege that the debtor, whom he charges with the intent to give an unfair preference, is unable to pay his debts, than it requires such an allegation concerning a debtor charged with intent to defraud, or with being about to leave the state, or with residing

out of the state, or with concealing himself to avoid being cited.

[6] It is insisted that upon the trial of the motion to dissolve the attachment the burden of proof was thrown upon the plaintiff, and was not sustained.

Article 258 of the Code of Practice reads (italics by the court):

"If the *defendant* \* \* \* *prove* \* \* \* that the allegations on which the order for attachment had been obtained were false, such attachment shall be dissolved, and the party will be allowed to proceed in his defense in the ordinary way."

Defendants' counsel refer to one or two cases (in which the Code of Practice was not alluded to), and which seem to hold that it is enough for the defendant in attachment to make a prima facie showing negativing the averments of the affidavit of the plaintiff to throw upon the latter the burden of proving their verity. Offutt v. Edwards, 9 Rob. 90; Bloch v. Creditors, 46 La. Ann. 1342, 16 South. 267. We are of opinion that a more correct interpretation of the law, as above quoted, is to be found in Herrmann & Vignes v. Amédée, 30 La. Ann. 395, where it is said (italics by the writer):

"We do not understand the district judge to mean that in all cases of motions to dissolve attachments the plaintiff is obliged to prove the truth of the allegations which he has sworn to in order to obtain the writ. *It is only where the allegations* so sworn to by him are denied, and the *prima facie case made by his affidavit* is *rebutted, that he must support his affidavit by proof*," etc.

In Hardie & Co. v. Colvin, 43 La. Ann. 852, 9 South. 745, the conclusion of the court, as stated in the syllabus, was:

"A defendant who alleges in his answer the untruthfulness of plaintiff's affidavit for attachment must make out the charge by a fair preponderance of proof."

In Simons v. Jacobs, 15 La. Ann. 426, the court, after referring to the ruling in Brumgard v. Anderson, 16 La. 341, and the circumstances of the case under consideration, said:

"In the case at bar the testimony [of the defendant in attachment] by no means destroys the presumption arising from the affidavit."

And so we find here. Defendant testified that he was shipping his sugar under a contract, and that he had no intention of giving an unfair preference to Cahn & Co., but the fact is that, if his crop of 1913 yielded, or promised when defendant testified to yield, a surplus beyond the amount required to satisfy Cahn & Co.'s pledge (and the evidence strongly indicates that it would, and did, yield such surplus), then for defendant to continue to ship under the contract, such as it was, was to give Cahn & Co. an unfair preference, within the meaning of the law, and defendant must be presumed to have intended the necessary consequence of his acts. In that connection it appears to us that even defendant's proposed settlement with his creditors contemplated a preference in favor of Cahn & Co. as part of the idea (with which defendant and counsel are apparently possessed) that the stipulation in regard to the imputation of payments is as binding, not only on him, but on his creditors, as any other in his contract with that firm, and that it gives them, in effect, the same rights with regard to the ordinary debts due them as with regard to the debt due for advances. Thus in the motion to dissolve we find the following allegations concerning the proposed settlement, to wit (italics by the court):

"That for the past two months mover herein has been negotiating with all of his creditors with a view of paying a certain percentage on his claims and to have the balance extended for one and two years, and that this was conditioned upon all of the creditors accepting this proposition; that his settlement contemplated the shipment of all sugar to Leon Cahn & Co.; that under the agreement such shipment was necessary; and that the proposed cash payment would only be made *after the sugar was shipped and Leon Cahn & Co. settled with.*"

And the impression created by those allegations (especially the last) is strengthened

by the circumstance that, although counsel say in their brief that all the creditors, except two, agreed to the settlement, we fail to find among the signatures to the written proposition filed in evidence that of Cahn & Co.

Concerning the question whether at the date of the attachment there was a surplus in the hands of Cahn & Co. beyond the amount required to satisfy their claim for advances, and, if not, whether it was reasonably certain that there would be such a surplus, and that it would inevitably be appropriated, so far as needed, to the payment of debts due that firm other than the debt for advances to make the crop, the evidence disclosed the following condition of affairs: Mr. Bonvillain testified that he was unable to state, even in round figures, the condition of his account with Cahn & Co., and that no one in the place would know, "either accurately or in round figures," the amount that Cahn & Co. had advanced in 1913.

"The only things we can go by," he said, "are the liens and privileges that have been executed, and they must have advanced that amount, or they would not have called for them."

He afterwards said:

"I don't believe we have sufficient money to my credit to finish paying the labor bills, grinding expenses, in Leon Cahn & Co.'s hands."

He did not say that he had not shipped enough sugar to reimburse the advances made and to be made for the entire crop, and we rather doubt whether he would have made such a statement. As we understand him, he considered that Cahn & Co. had the right to appropriate the proceeds of the crop to the payment of any debt that he owed them, and he was probably not altogether informed as to the manner or extent in and to which they had exercised that right, but had some reason to believe that they had appropriated part, at least, of the proceeds to the payment of some past-due indebtedness, open account, or for money loaned or furnished for the purchase of cane, and had

left part, perhaps, of the debt due for advances on the crop to be paid from the proceeds of future shipments. He further testified that prior to the attachment he had shipped (to Cahn & Co.) 11,775 bags of sugar, of the average net weight of 325 pounds, and that sugar was at that time selling at 3.75 to 3.3 cents a pound. Taking 3⅓ cents as the average price, Cahn & Co. would have realized (on 3,826,875 pounds of sugar) $127,-563.50. The attachment issued on December 6th, and plaintiff offered to prove that the total shipments would have amounted to 6,000,000 of pounds without, as we understand, including third sugars and molasses. However that may be, 6,000,000 pounds, at 3⅓ cents would have brought, and probably did bring, not less than $200,000. On the other hand, it is not pretended that the advances exceeded $150,000, and we are not convinced that as much as that was received or expended in that way.

Concerning defendant's pre-existing indebtedness, we have found that, beginning with the contract of January, 1911, under which defendant had given his notes for $100,000 for money to be advanced for the crop of that year "and balance then due," and ending with the contract of October 13, 1913, he had contracted for a total of $220,000. How much of that amount he had actually received and how much he had repaid up to the date of the trial we have no means of knowing, as he was unable or unwilling to throw any light upon the subject, and refused to produce his books. He did say, however, that he had lost the best part of his crop in 1911, and had also lost in 1912, from which we conclude that he started the year 1913 considerably in debt to Cahn & Co., and to that ordinary debt or mortgage debt, as it probably became, for which Cahn & Co. had no privilege on the crop of 1913, they were authorized to attribute the surplus proceeds of that crop, amounting, as it seems likely, to not less than $50,000; whilst

the plaintiff, who appears to have furnished the fertilizer, which went, remotely at least (as we assume), to the making of the crop, as yet gets nothing.

Our brother of the district court predicated his judgment dissolving the attachment mainly, as we understand, upon the ruling of this court in Bank v. Martin, 52 La. Ann. 1628, 28 South. 130, of which he says:

"The court considers this case a practical duplicate of the case of the Bank of New Iberia v. Martin," etc.

But in that case the bank seized sugar, part of defendant's crop, which, as in this case, was pledged to a factor for the advances made for its production, and which defendant was engaged in shipping in satisfaction of the debt thus incurred to the pledgee.

It does not appear that he owed the pledgee any other debt, or that his contract with the pledgee authorized the latter to appropriate the proceeds of the sugar to the payment of any other debt, which are the distinguishing features of the present case, by reason of which it is decided differently from the case cited.

Our conclusion is that the judgment appealed from should be reversed, without prejudice to the rights of Cahn & Co., who, not having intervened in, or been made parties to, the rule to dissolve the attachment, are entitled to assert their rights by way of intervention in the main case.

It is accordingly adjudged and decreed that the judgment appealed from be annulled and reversed, and that the attachment herein issued be maintained without prejudice to the right of Leon Cahn & Co. to assert their claim by way of intervention in the main case, the defendant to pay the costs of the appeal and, in the district court, of the rule to dissolve the attachment, all other costs to await the judgment on the merits.

See dissenting opinion of O'NIELL, J., 71 South. 860.